IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| THE UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>OSCAR ANTONIO LARA GARCIA<br><br>Defendants. | ORDER & MEMORANDUM DECISION<br><br><br>2:05CR391 TC |

The grand jury indicted Oscar Antonio Lara-Garcia on one count of being illegally in the United States, a violation of 8 U.S.C. § 1326.  Mr. Lara-Garcia has moved to suppress all evidence derived from his detention and interrogation which occurred on May 25, 2005.

Although he acknowledges that his initial stop on a traffic violation was justified, Mr. Lara-Garcia contends that his continued detention was unreasonably prolonged.  The court finds that the officers were justified in detaining Mr. Lara-Garcia because of questions about his identity.  But court also concludes that later questioning by an Agent of the Bureau of Immigration and Customs Enforcement (ICE) violated the prophylactic measured of Miranda v. Arizona, 384 U.S. 436 (1966), rendering Mr. Lara-Garcia's statement about his immigration status inadmissible.  Additionally, the detention by ICE based upon that illegally obtained statement was not supported by probable cause and all evidence obtained as a result of that further detention is suppressed.  Mr. Lara-Garcia's motion to suppress is GRANTED.

## FACTS[1]

The Traffic Stop

On May 25, 2005, at about 10:00 a.m., Mr. Lara-Garcia was driving to Alpine, Utah, with one or two passengers.[2]  Henry Robinson, who testified at the August 30, 2005 evidentiary hearing, testified that he was also driving to Alpine that day, saw the truck driven by Mr. Lara-Garcia and believed that the driver might be intoxicated.  Mr. Robinson testified that Mr. Lara-Garcia "was crossing the yellow line and going to the side of the road, almost off the road.  At two different times he almost rear-ended cars that were stopped ahead of us at the lights." (Transcript of Aug. 30, 2005 Evid. Hearing ("Tr.") at 13.)   Based upon his observations, Mr. Robinson called 911.  While speaking with the 911 operator, Mr. Robinson followed the truck driven by Mr. Lara-Garcia.

Mr. Robinson remained on the phone with the 911 operator when the Mr. Lara-Garcia was pulled over by Officer Cal Miller and Detective Verde of the Alpine Police Department at about 10:20 a.m.   Officer Miller testified at the evidentiary hearing.  Officer Miller testified that the dispatcher told him that there was a report of a driver possibly under the influence who had "crossed over the double yellow lines numerous times" and had almost crashed head-on with another car.  (Tr. at 35.)  The dispatcher gave Officer Miller a "license plate number, as well as a vehicle description, and approximate location of [where] the vehicle was driving."  (Id.) Approximately five to ten minutes after receiving this information, Officer Miller saw the truck described by the dispatcher.  Detective Verde pulled Mr. Lara-Garcia over and Officer Miller

---

[1]Unless otherwise noted, all facts are derived from the August 30, 2005 Evidentiary Hearing in this matter.

[2]There is conflicting testimony regarding the number of passengers in the vehicle.  But the court finds it is sufficient to note that Mr. Lara-Garcia was not alone in the vehicle.

pulled in directly behind Detective Verde.  The 911 operator  asked Mr. Robinson to stay at the

site of the traffic stop and Mr. Robinson parked behind Officer Miller.  Mr. Robinson testified:

"after the two officers approached the vehicle that they had stopped, one of them came back . . .

and asked me if I was the one who had made the call and asked me if I could wait."  (Id. at 12.)

> The Roadside Detention

_____When Officer Miller asked Mr. Lara-Garcia for his license and registration, Mr. Lara-

Garcia "could not produce any type of identification or driver's license at that time."  (Tr. at 38.)

Officer Miller testified that Mr. Lara-Garcia gave him the name "Juan Garcia" and a date of

birth.  But Mr. Lara-Garcia "could not remember his social security number completely."  (Id. at

40.)  Mr. Lara-Garcia said that the truck belonged to his brother, who was also his employer.

Officer Miller then told Mr. Lara-Garcia that he had been stopped based on Mr. Robinson's

report that he had been swerving.  Officer Miller testified: "Mr. Garcia advised me that 'yes' he

did swerve.  Apparently he accidentally dropped a drink in his lap on the front seat of the vehicle

and he was trying to pick it up."  (Id.).  Officer Miller further testified: "I did not smell any type

of an alcoholic beverage even in the truck or on his breath."  (Id.)  Mr. Robinson also testified

that while he was waiting at the site of the traffic stop:

> One of the officers came back . . . and said that they perceived no smell of
> alcohol, no evidence of alcohol or drugs, and offered the explanation that the
> gentleman who was driving said that he had spilled his drink on the seat.  That his
> pants were wet and that the seat was wet, and that  was why he'd been driving in a
> manner that brought my attention to it.

(Id. at 12.)

 Officer Miller testified that after he concluded that Mr. Garcia was not under the

influence of drugs or alcohol, he "went back to my vehicle to check him to make sure that he had

a valid driver's license. . . . [The dispatcher] returned and advised me he did not have a valid

driver's license." (Tr. at 41.)  Officer Miller  wrote a ticket for driving without a license and also

for equipment violations ( lack of a mirror and balding tires).[3]

Officer Miller returned to the truck to ask if anyone could pick up the vehicle or if any of

the other passengers could drive.  But apparently no one in the truck had a valid driver's license.

Officer Miller  asked the dispatcher to call the person listed on the registration to have him come

get the truck. During this conversation, the dispatcher told Officer Miller that Mr. Garcia "had an

N.C.I.C. hit out of California" for a parole violation and that California wanted to extradite him.

(Id. at 43.)  Officer Miller continued: "At that time . . . I called dispatch again to verify this

individual. It did come back with the individual's name and date of birth with a physical

description."  (Id.)

Officer Miller testified: "What I received from dispatch is the height and weight matched

as far as the individual I had.  The weight I believe was a few pounds off.  But for the – as far as

dispatch advised me . . . the N.C.I.C. hit on him matched the description of the individual I had

stopped for the reckless driving."  (Tr. at 55.)  But Officer Miller also clarified that the hair color

was not a match.   While still by the side of the road, Officer Miller tried to get further

descriptive information for approximately an hour and a half to confirm whether Mr. Lara-Garcia

was the "Juan Garcia" identified in the N.C.I.C. hit.

The Detention at the Police Station

Because he was unable to verify whether Mr. Lara-Garcia was, in fact, the subject of the

California warrant, Officer Miller  took Mr. Lara-Garcia to the Alpine police station.  Officer

---

[3]The citation contains the name Juan Fierro, which is a name that Mr. Lara-Garcia also
gave to Officer Miller during the course of the stop.  At the evidentiary hearing, Officer Miller
clarified that Mr. Lara-Garcia initially gave him the name of Juan Garcia and then, later, gave a
middle name of Fierro and then, even later, changed his answer so the last name was Fierro.

Miller described his reasons for taking Mr. Lara-Garcia to the police station: "I was finishing up an N.C.I.C. hit, trying to get him either identified as the individual or not identified as the individual." (Tr. at 70-71.) Mr. Lara-Garcia was handcuffed consistent with police policy, but was not informed of his rights under <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966).

At about this time, the dispatcher informed Officer Miller that the Bureau of Immigration and Custom Enforcement (ICE) had contacted the Alpine Police and asked if they needed assistance identifying Mr. Lara-Garcia. Apparently, a supervisor at ICE had been listening to the police band and heard Officer Miller in his efforts to identify Mr. Lara-Garcia. Officer Miller answered that he could use ICE's help.

At the evidentiary hearing, Agent Timothy Chard of ICE testified: "Because we work with all the police departments. . . anytime we have individuals in question and they're trying to identify individuals, we try to assist them as much as possible." (<u>Id.</u> at 77.) At the instruction of his supervisor, Agent Chard, with Agent Gamarra, went to the police station.

Questioning by Agent Chard

Officer Miller testified that "at the time [ICE] arrived at our police department I turned the case over to [ICE Agent Timothy Chard]." (<u>Id.</u> at 71.) At this point, Officer Miller had not confirmed whether Mr. Lara-Garcia was the subject of the California warrant. Officer Miller testified: "I advised Agent Chard . . . of the findings that I was told through our dispatch. Also advised him of what originated the stop so far as a reckless driving complaint. After that, [Agent] Chard took over and left with [Mr. Lara-Garcia]." (<u>Id.</u> at 73.) Agent Chard first saw Mr. Lara-Garcia in a conference room at the Alpine police station.

Agent Chard testified that he and Agent Gamarra "went in [the conference room] and talked to Mr. [Lara-Garcia] and basically asked him information about his name, his date of

birth, place of birth, and his immigration status in the United States."  (Tr. at 78-79.) Mr. Lara-Garcia was not given his Miranda rights before Agent Chard asked these questions.  Agent Chard testified that Mr. Lara-Garcia responded to his questions by stating that "his name was Juan Garcia . . . . And that he was from Mexico and is illegally in the United States."  (Id. at 79.)

After Mr. Lara-Garcia's admission, Agent Chard left the conference room at the Alpine police station.  By this point, the Alpine police had received sufficient information from California to verify that Mr. Lara-Garcia was not the person named in the warrant.   Agent Chard testified:

> I asked [the officer] what they were going to do with [Mr. Lara-Garcia], if they were going to book him in the jail or not.  And they said that they've already cited him for theses traffic citations that they did the traffic stop on, and since they clarified that it wasn't him on the N.C.I.C. they were just going to release him. And so we took custody of [Mr. Lara-Garcia].

(Tr. at 79.)

Shortly after arriving at the ICE office, the agents made further attempts to verify Mr. Lara-Garcia's true identity.  Agent Chard testified: "We have a system that's called the Ident machine, and anybody that we come in contact with we assign an alien file to that individual and then put them on the Ident machine to identify them."  (Id. at 80.)  Agent Chard ran Mr. Lara-Garcia's right and left index fingerprints through the machine and "received a hit under . . . his correct name Lara-Garcia."  (Id. at 80.)  Through this database, Agent Chard discovered that Mr. Lara-Garcia "was a prior aggravated reentry."  (Id. at 80.)  Mr. Lara-Garcia admitted that Lara-Garcia was his correct name.  Mr. Lara-Garcia was then read his Miranda rights and gave a written statement to another agent.

## ANALYSIS

In his motion to suppress, Mr. Lara-Garcia challenges, generally, the scope of his

6

detention resulting from the traffic stop for reckless driving on May 25, 2005.  Specifically, Mr. Lara-Garcia contends that the officers did not have a sufficient basis to detain him to investigate his immigration status in the United States.  Mr. Lara-Garcia does not challenge the validity of the initial stop for reckless driving. For the purposes of this motion the court first analyzes Mr. Lara-Garcia's detention by the Alpine police and, second, the investigation and detention by ICE.

**The Officers Had a Sufficient Basis to Initially Stop Mr. Lara-Garcia and to Detain Him Until They Could Determine Whether He Was the Person Sought by the Warrant.**

A traffic stop is generally analyzed "under the principles pertaining to investigatory detentions."  United States v. Tibbetts, 396 F.3d 1132, 1136 (10th Cir. 2005).  A court asks "first whether the officer's action was justified at its inception, and second, whether it was reasonably related in scope to the circumstances that justified the interference in the first place."  Id. Officers may initiate an investigatory detention only if they have reasonable, articulable suspicion of criminal activity.  Terry v. Ohio, 392 U.S. 1, 21-22 (1968)  Here, Mr. Lara-Garcia concedes that Officer Miller and Detective Verde had sufficient reasonable suspicion to initiate a traffic stop based upon the report of reckless driving.  The question is whether the detention following the stop was unreasonably prolonged.

If a detention is supported by reasonable suspicion, officers are generally permitted to detain a person to ascertain his or her identity.  See Terry, 392 U.S. at 22-23 (brief questioning during stop permitted to ascertain identity); United States v. Bustillos-Munoz, 235 F.3d 505, 514 (10th Cir. 2001) (officer's request for license and registration permitted even though officer had already determined driver not guilty of traffic violation).  Here, Mr. Lara-Garcia gave Officer Miller several names. Officer Miller was justified under the Fourth Amendment to verify whether there was a valid driver's license under the names given to see if Mr. Lara-Garcia possessed a valid driver's license and also whether he had any outstanding warrants. United

7

States v. Holt, 264 F.3d 1215, 1221 (10th Cir. 2001) ("the motorist may be detained for a short period while the officer runs a background check to see if there are any outstanding warrants or criminal history pertaining to the motorist even though the purpose of the stop had nothing to do with such prior criminal history."); United States v. Elliott, 107 F.3d 810, 813 (10th Cir. 1997) ("A law enforcement officer conducting a routine traffic stop may request a driver's license and vehicle registration, run a computer check, and issue a citation").

An officer can prolong a traffic stop if the officer "has an objectively reasonable and articulable suspicion that illegal activity has occurred or is occurring." United States v. Hunnicutt, 135 F.3d 1345, 1349 (10th Cir. 1998); see also United States v. Cervine, 347 F.3d 865, 868-69 (10th Cir. 2003). Accordingly, once Officer Miller had received information that there was an outstanding warrant for "Juan Garcia," the name given him by Mr. Lara-Garcia, Officer Miller had reasonable suspicion to detain him until he could determine whether Mr. Lara-Garcia was wanted in California.

Mr. Lara-Garcia contends that his detention evolved into a custodial arrest that must be supported by probable cause. And it does appear that at some point, Officer Miller did arrest Mr. Lara-Garcia, more likely than not when he took him to the Alpine Police Station. Probable cause exists where "the facts and circumstances within [the officer's] knowledge and of which they had reasonably trustworthy information [are] sufficient to warrant a prudent man in believing that the [arrestee] had committed or was committing an offense." United States v. Klein, 93 F.3d 698, 701 (10th Cir. 1996) (quoting Beck v. Ohio, 379 U.S. 89, 91 (1964)); see also United States v. Gama-Bastidas, 142 F.3d 1233 (10th Cir. 1998). Officer Miller testified that the description he had received through the dispatcher led him to conclude that Mr. Lara-Garcia could reasonably be the person identified in the warrant. Additionally, the NCIC warrant hit was obtained based

upon a name and birth date provided by Mr. Lara-Garcia himself.  To the extent that the detention of Mr. Lara-Garcia may have evolved into an arrest, it was supported by probable cause.

### Agent Chard failed to Inform Mr. Lara-Garcia of His Rights According to <u>Miranda</u> Before Inquiring About His Immigration Status.

After Mr. Lara-Garcia was taken to the Alpine Police Station, he was taken in handcuffs to a conference room with Agent Chard.  Agent Chard asked Mr. Lara-Garcia his name, place and date of birth, and his immigration status.  After Mr. Lara-Garcia's admission that he was not legally in the United States, Alpine police officers told Agent Chard that they were prepared to release Mr. Lara-Garcia.  Agent Chard then took Mr. Lara-Garcia into custody.  Mr. Lara-Garcia challenges the constitutionality of this detention and questioning.

It is undisputed that Mr. Lara-Garcia had not been informed of his rights according to <u>Miranda</u>, at the time of his questioning by Agent Chard.  <u>Miranda</u> requires that, before questioning a suspect in custody, officers must inform him that he has a right to remain silent, that his statements may be used against him at trial, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him. <u>Miranda</u>, 384 U.S. at 478-79.   Absent proof that proper warnings were given, evidence obtained through custodial interrogation is inadmissible at trial.  <u>Id.</u> at 479.

Courts first assess the objective circumstances of the situation from the perspective of a person in the suspect's position to determine whether the suspect is in custody for the purposes of <u>Miranda</u>. <u>Stansbury v. California</u>, 511 U.S. 318, 323 (1994).  Here, in light of all the circumstances, including the fact that Mr. Lara-Garcia was handcuffed  and taken to the Alpine Police Station, it is clear that Mr. Lara-Garcia was in custody.

Questions asked while a suspect is in custody constitute interrogation if, under all the

circumstances involved in a given case, the questions are "reasonably likely to elicit an incriminating response from a suspect." Rhode Island v. Innis, 446 U.S. 291, 301 (1980); see also United States v. Rambo, 365 F.3d 906, 909 (10th Cir. 2004).  Police are permitted to ask routine biographical information and "routine booking questions."  But "where questions regarding normally routine biographical information are designed to elicit incriminating information, the questioning constitutes interrogation subject to the strictures of Miranda." United States v. Parra, 2 F.3d 1058, 1068 (10th Cir. 1993).  Agent Chard's questioning went beyond the scope of routine booking information or an inquiry related to routine biographical information.  Agent Chard permissibly asked Mr. Lara-Garcia for his name, birth date, and place of birth.   But when Agent Chard asked Mr. Lara-Garcia about his immigration status without having administered his Miranda rights and without the presence of counsel, Agent Chard failed to assure that Mr. Lara-Garcia's Fifth Amendment rights would not be violated  by seeking information that could lead to criminal prosecution.

Generally, the warnings required by Miranda, are prophylactic in nature and designed to protect against potential violations of the Fifth Amendment at trial. United States v. Patane, 542 U.S. 630, 636 (2004). "Failure to administer Miranda warnings creates a presumption of compulsion" implicating the Fifth Amendment which prohibits the use by the prosecution in its case in chief of compelled testimony.  Oregon v. Elstad, 470 U.S. 298, 306-07 (1985). Accordingly, failure to read a suspect his Miranda rights requires the suppression of those statements.  But the Supreme Court has found repeatedly that the prophylactic nature of the Miranda warnings, as compared with an actual constitutional violation, does not require the suppression of the fruits of that violation.  See Patane, 542 U.S. at 642-44; Elstad 470 U.S. at 307-308; Michigan v. Tucker, 417 U.S. 433, 446 (1974).

Here, Mr. Lara-Garcia's statement that he is in the United States illegally is suppressed because he was not informed of his rights according to Miranda at the time Agent Chard asked about his immigration status.  But the failure to inform Mr. Lara-Garcia of his rights does not dictate the suppression of all subsequently obtained evidence.

### The Arrest of Mr. Lara-Garcia by ICE Was Not Supported By Probable Cause and Violated Mr. Lara-Garcia's Fourth Amendment Rights.

After Agent Chard interviewed Mr. Lara-Garcia and obtained his admission that he was in the country illegally, the Alpine police officers told Agent Chard that they were prepared to release Mr. Lara-Garcia.  Having cited Mr. Lara-Garcia for the traffic violations and determined that he was not the man sought by the warrant the Alpine police officers had apparently determined that there was no reason to continue the detention.  Accordingly, when Agent Chard took Mr. Lara-Garcia into custody it was solely on the belief that Mr. Lara-Garcia was in the country illegally which was predicated on Mr. Lara-Garcia's admission that the court has now found must be suppressed.

As noted above, an investigatory detention has the potential to evolve into an arrest requiring a finding of probable cause.  See Florida v. Royer, 460 U.S. 491, 502-03 (1983).  In determining whether an investigatory detention has become an arrest the court is to consider the diligence of police in resolving their reasonable suspicions as quickly as possible, the scope and nature of the restraints placed on the individual's liberty and whether police transported the detainee to another location.  See, e.g., Royer, 460 U.S. at 502-03; United States v. Lambert, 46 F.3d 1064, 1068-71 (10th Cir. 1995); United States v. Oliver, 363 F.3d 1061, 1067 (10th Cir. 2004); United States v. Anderson, 981 F.2d 1560, 1566 (10th Cir. 1992); United States v. Soto, 988 F.2d 1548, 1558 (10th Cir. 1993).

Here, Mr. Lara-Garcia was detained by the Alpine police for at least two hours,

11

transported to the police station in handcuffs, placed in a conference room while still handcuffed and subjected to questioning by ICE regarding matters unrelated to the initial stop.  Nevertheless, the court finds that the Alpine police officers were diligent in confirming that Mr. Lara-Garcia was not the man sought by the warrant and resolving all issues related to the initial traffic stop. But Mr. Lara-Garcia was then transported by ICE to yet another location, still in handcuffs, was fingerprinted and had his identity obtained through the Ident machine.  It is clear that when Agent Chard took  Mr. Lara-Garcia to the ICE office, the detention had evolved into an arrest requiring probable cause.

Probable cause exists when police have knowledge of facts and circumstances to warrant a belief by a prudent person that an offense has been or is being committed.  Wong Sun v. United States, 371 U.S. 471, 479 (1963).  Here, there is no doubt that Agent Chard had a reasonable belief that Mr. Lara-Garcia had committed a crime based upon Mr. Lara-Garcia's admission that he was in the country illegally.  But it is apparent that the only reason Mr. Lara-Garcia was detained after he was cleared of the warrant was that he had admitted that he was in the country illegally.  Absent the illegally obtained admission by Mr. Lara-Garcia, the government has not directed the court to any basis for probable cause to further detain Mr. Lara-Garcia. As the Supreme Court has written: "those subjected to coercive police interrogations have an automatic protection from the use of their involuntary statements (or evidence derived from their statements) in any subsequent criminal trial." United States v. Patane, 542 U.S. 630, 640 (2004)(emphasis added) (quoting Chavez v. Martinez, 538 U.S. 760, 769 (2003)). Because the court has suppressed this statement, it cannot be a basis to establish probable cause.  And Mr. Lara-Garcia's Fourth Amendment rights were violated.

**Mr. Lara-Garcia's Admission Regarding His Immigration Status and All Evidence Obtained as a Result of his Continued Detention is Suppressed.**

The government contends that evidence of identity is not subject to suppression. "The 'body' or identity of a defendant or respondent in a criminal or civil proceeding is never itself suppressible as a fruit of an unlawful arrest, even if it is conceded that an unlawful arrest, search, or interrogation occurred." I.N.S. v. Lopez-Mendoza, 468 U.S. 1032, 1039 (1984). The Fifth and Ninth Circuits have concluded that this statement in Lopez-Mendoza means that a defendant's identity in criminal prosecutions is not suppressible. United States v. Roque-Villanueva, 175 F.3d 345, 346 (5th Cir. 1999); United States v. Guzman-Bruno, 27 F.3d 420, 421-22 (9th Cir. 1994). But the Eighth Circuit has reached a different conclusion. United States v. Guevara-Martinez, 262 F.3d 751, 755-56 (8th Cir. 2001). The Tenth Circuit has not addressed the issue. But in United States v. Olivares-Rangel, 324 F. Supp.2d 1218 (D.N.M. 2004), a district judge in New Mexico found the Eighth Circuit's reasoning persuasive and held that evidence of identity was suppressible where there was "absolutely no justification for the stop.". Id. at 1224.

The Eighth Circuit, in Guevara-Martinez, explained that there is a difference between jurisdictional challenges to identity evidence and evidentiary challenges to fingerprint evidence in criminal cases. Olivares-Rangel, 324 F. Supp.2d at 1224; see also Lopez-Mendoza, 468 U.S. at 1039; Guevara-Martinez, 262 F.3d at 756. Here, Mr. Lara-Garcia brings an evidentiary challenge and does not contest the court's jurisdiction over his person. The Eight Circuit wrote:

> We apply the exclusionary rule whenever evidence has been obtained 'by exploitation' of the primary illegality instead of 'by means sufficiently distinguishable to be purged of the primary taint.' Evidence can be obtained 'by exploitation' of an unlawful detention even when the detention is not the sole purpose of gathering evidence.

Guevara-Martinez, 262 F.3d at 755 (internal citations omitted) (quoting Wong Sun v. United States, 371 U.S. 471, 488 (1963). The court further reasoned that to hold that evidence of

13

identity is never suppressible would contravene the general rule that fingerprints "obtained as a result of constitutional violations and used for investigatory purposes must be suppressed in the criminal case flowing from that investigation." Olivares-Rangel, 324 F. Supp.2d at 1224 (citing Hayes v. Florida, 470 U.S. 811, 815-16 (1985); Davis v. Mississippi, 394 U.S. 721, 727 (1969). The Eighth Circuit's holding in Guevara-Martinez is consistent with the general principles of the exclusionary rule and is persuasive.

Here, as discussed above, there are no problems with the initial detention of Mr. Lara-Garcia.  It was clearly reasonable for officers to detain Mr. Lara-Garcia until they could determine whether he was the man sought by the warrant.  Agent Chard's question about Mr. Lara-Garcia's immigration status, without having Mirandized him, renders Mr. Lara-Garcia's statement inadmissible. Because the continued detention of Mr. Lara-Garcia was reliant on that inadmissible statement it was unsupported by probable cause. Accordingly, ICE's detention of Mr. Lara-Garcia violated the Fourth Amendment and all evidence obtained as a result of that detention, including Mr. Lara-Garcia's fingerprints, is suppressed.

### The Inevitable Discovery Doctrine Does Not Apply to Render the Evidence Obtained in Violation of the Fourth Amendment Admissible.[4]

The government contends that the exclusionary rule should not apply because the evidence of Mr. Lara-Garcia's identity would have inevitably been discovered by lawful means. This argument is based, primarily, on Agent Chard's testimony that "If he would have never given us his name, we would have still taken him back to the office to identify him" and that he

---

[4]The government also contends that the "booking exception" applies to render the fingerprint evidence admissible and that the United States can require that a defendant produce a post-indictment fingerprint exemplar before trial.  But these arguments have been raised for the first time in the court-requested simultaneous supplemental briefing.  Accordingly, Mr. Lara-Garcia has not had a full opportunity to address these arguments and the court will not consider these late-raised arguments.

would have still taken Mr. Lara-Garcia's fingerprints. (Tr. at 81.)

"Under the inevitable discovery doctrine, even if the initial search and arrest was unlawful, 'the exclusionary rule is inapplicable if the evidence inevitably would have been discovered by lawful means.'"  United States v. White, 326 F.3d 1135, 1138 (10th Cir. 2003) (quoting United States v. Souza, 223 F.3d 1197, 1202 (10th Cir. 2000)).  The government has the burden to prove "by a preponderance of the evidence that the evidence in question would have been discovered in the absence of the Fourth Amendment violation."  Souza, 223 F.3d at 1202. The court makes its determination based upon "demonstrated historical facts," and not "speculative elements." White, 326 F.3d at 1138 (citing Nix v. Williams, 467 U.S. 431, 444 n. 5 (1984)).

Here, the government notes that Agent Chard would have taken Mr. Lara-Garcia into custody if "he would have never given us his name" and that Mr. Lara-Garcia gave a false name.[5] Based upon these facts, the government argues that ICE would have taken the necessary steps to confirm Mr. Lara-Garcia's identity, including taking his fingerprints.

The government has not met its burden.  Mr. Lara-Garcia did provide a name. And Agent Chard testified only that if he had not received a name he would have taken Mr. Lara-Garcia into custody.  Additionally, any arrest after Mr. Lara-Garcia had been cleared by the Alpine police would likely not have been supported by probable cause absent inclusion of the statement obtained without administering his rights according to Miranda.  Accordingly, the government has not established by a preponderance of the evidence that Mr. Lara-Garcia's fingerprints would

---

[5]The court notes that it is not apparent that the police were certain, or even had a firm belief, that Mr. Lara-Garcia had given a false name.  The name provided was checked and led to the NCIC hit and the investigation regarding Mr. Lara-Garcia's identity appears to have been centered around an attempt to determine whether Mr. Lara-Garcia was the "Juan Garcia" sought by the warrant and not whether he was actually named "Juan Garcia."

have been inevitably and <u>lawfully</u> obtained.

## ORDER

For the reasons set forth, Mr. Lara-Garcia's motion to suppress is GRANTED.  Mr. Lara-Garcia's statement that he is in the country illegally and all evidence obtained as a result of his detention by ICE after the Alpine police were prepared to release Mr. Lara-Garcia is suppressed.

SO ORDERED this 28th day of December, 2005.

BY THE COURT:

TENA CAMPBELL
United States District Judge

16