IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| THE UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>OSCAR ANTONIO LARA-GARCIA<br><br>Defendant. | AMENDED ORDER & MEMORANDUM DECISION<br><br><br>2:05 CR 391 TC |

The Alpine Police Department detained Oscar Antonio Lara-Garcia for approximately two hours after pulling over a truck that Mr. Lara-Garcia was driving.  Mr. Lara-Garcia carried no identification, gave inconsistent answers when officers asked his name, and was unable to remember his social security number.  One name provided by Mr. Lara-Garcia matched that of an individual wanted in California for a parole violation.  At the roadside, Officers attempted to confirm whether Mr. Lara-Garcia was the man identified in the California warrant.  Ultimately officers transported Mr. Lara-Garcia to the Alpine police station, where he was placed in a conference room while officers continued their efforts to confirm his identity.  While at the station, Mr. Lara-Garcia was questioned by an immigration official and admitted that he was in the United States illegally.

A grand jury indicted Mr. Lara-Garcia on one count of illegally reentering the United States.  Mr. Lara-Garcia moved to suppress all evidence obtained as a result of his detention, which Mr. Lara-Garcia claims was unreasonably prolonged.  The court finds that the officers were justified in detaining Mr. Lara-Garcia because of questions about his identity.  But the court

also concludes that questioning at the Alpine police station by an agent of the Bureau of

Immigration and Customs Enforcement (ICE) violated Miranda v. Arizona, 384 U.S. 436 (1966),

rendering Mr. Lara-Garcia's statement about his immigration status inadmissible.  Nevertheless,

the court concludes that law enforcement officials would have inevitably discovered Mr. Lara-

Garcia's identity through lawful means and therefore declines to suppress evidence obtained

following Mr. Lara-Garcia's admission.  Additionally, the court takes this opportunity to clarify

the time remaining on Mr. Lara-Garcia's speedy trial clock.

### FACTS[1]

The Traffic Stop

On May 25, 2005, at about 10:00 a.m., Mr. Lara-Garcia was driving to Alpine, Utah, with

one or two passengers.[2]  Henry Robinson, who testified at the August 30, 2005 evidentiary

hearing, testified that he was also driving to Alpine that day.  Mr. Robinson saw the truck driven

by Mr. Lara-Garcia and believed that the driver of the truck might be intoxicated.  Mr. Robinson

testified that Mr. Lara-Garcia "was crossing the yellow line and going to the side of the road,

almost off the road.  At two different times he almost rear-ended cars that were stopped ahead of

us at the lights."  (Transcript of Aug. 30, 2005 Evid. Hearing ("8/30/05 Tr.") at 13.)   Mr.

Robinson called 911 to report his concerns.  While speaking with the 911 operator, Mr. Robinson

followed the truck driven by Mr. Lara-Garcia.

Mr. Robinson remained on the phone with the 911 operator when Mr. Lara-Garcia was

pulled over by Officer Cal Miller and Detective Verde of the Alpine Police Department at about

---

[1]All facts are derived from the evidentiary hearings held on August 30, 2005, and March 24, 2006.

[2]There is conflicting testimony regarding the number of passengers in the vehicle.  But the court finds it is sufficient to note that Mr. Lara-Garcia was not alone in the vehicle.

10:20 a.m.  Officer Miller testified that the dispatcher told him there was a report of a driver possibly under the influence who had "crossed over the double yellow lines numerous times" and had almost crashed head-on with another car.  (8/30/05 Tr. at 35.)  The dispatcher gave Officer Miller a "license plate number, as well as a vehicle description, and approximate location of [where] the vehicle was driving."  (Id.)

Approximately five to ten minutes after receiving this information, Officer Miller saw the truck described by the dispatcher.  Detective Verde pulled Mr. Lara-Garcia over and Officer Miller pulled in directly behind Detective Verde.  The 911 operator  asked Mr. Robinson to stay at the site of the traffic stop.  Complying, Mr. Robinson parked behind Officer Miller.  Mr. Robinson testified that "after the two officers approached the vehicle that they had stopped, one of them came back . . . and asked me if I was the one who had made the call and asked me if I could wait."  (Id. at 12.)

The Roadside Detention

When Officer Miller asked Mr. Lara-Garcia for his license and registration, Mr. Lara-Garcia "could not produce any type of identification or driver's license."  (Id. at 38.)  Officer Miller testified that Mr. Lara-Garcia gave him the name "Juan Garcia" and a date of birth.  But Mr. Lara-Garcia "could not remember his social security number completely."  (Id. at 40.)  Mr. Lara-Garcia said that the truck belonged to his brother, who was also his employer.  Officer Miller then told Mr. Lara-Garcia that he had been stopped based on Mr. Robinson's report that he had been swerving.  Officer Miller testified: "Mr. Garcia advised me that 'yes' he did swerve. Apparently he accidentally dropped a drink in his lap on the front seat of the vehicle and he was trying to pick it up."  (Id.)  Officer Miller further testified: "I did not smell any type of an alcoholic beverage even in the truck or on his breath."  (Id.)  Mr. Robinson testified that while he

was waiting at the site of the traffic stop:

> One of the officers came back . . . and said that they perceived no smell of
> alcohol, no evidence of alcohol or drugs, and offered the explanation that the
> gentleman who was driving said that he had spilled his drink on the seat.  That his
> pants were wet and that the seat was wet, and that  was why he'd been driving in a
> manner that brought my attention to it.

(Id. at 12.)

 Officer Miller testified that after he concluded that Mr. Garcia was not under the

influence of drugs or alcohol, he "went back to [his police] vehicle to check ["Juan Garcia"] to

make sure that he had a valid driver's license. . . . [The dispatcher] returned and advised me he

did not have a valid driver's license."  (Id. at 41.)  Officer Miller prepared a citation for driving

without a license and also for equipment violations (lack of a mirror and balding tires).  The

citation contains the name Juan Fierro, which is a name that Mr. Lara-Garcia also gave to Officer

Miller during the course of the stop.  Officer Miller testified that Mr. Lara-Garcia initially gave

him the name of Juan Garcia and then, later, gave a middle name of Fierro and then, even later,

changed his answer once again, stating that his last name was Fierro.

Officer Miller returned to the truck to ask if anyone could pick up the vehicle or if any of

the other passengers could drive.  But apparently no one in the truck had a valid driver's license.

Officer Miller  asked the dispatcher to call the person listed on the registration to have him come

get the truck.  During this conversation, the dispatcher told Officer Miller that "Juan Garcia"

"had an N.C.I.C. hit out of California" for a parole violation and that California wanted to

extradite him.  (Id. at 43.)  Officer Miller testified: "At that time . . . I called dispatch again to

verify this individual. It did come back with the individual's name and date of birth with a

physical description."  (Id.)

According to Officer Miller, the information provided by dispatch "matched . . . the

individual I had."  (Id. at 55.)  Officer Miller testified that "[t]he weight I believe was a few

pounds off.  But for the--as far as dispatch advised me . . . the N.C.I.C. hit on him matched the

description of the individual I had stopped for the reckless driving."  (Id.)  Officer Miller also

indicated that the hair color was not a match.  Uncertain whether the man he was detaining was

the man described in the warrant, Officer Miller tried to get further descriptive information for

approximately an hour and a half to confirm whether the individual he pulled over was the "Juan

Garcia" identified in the N.C.I.C. hit.

        The Detention at the Police Station

        Because he was unable to verify whether Mr. Lara-Garcia was, in fact, the subject of the

California warrant, Officer Miller  took Mr. Lara-Garcia to the Alpine police station.  Officer

Miller described his reasons for taking Mr. Lara-Garcia to the police station as follows: "I was

finishing up an N.C.I.C. hit, trying to get him either identified as the individual or not identified

as the individual."  (Id. at 70-71.)  Mr. Lara-Garcia was handcuffed consistent with police policy,

but was not informed of his rights under Miranda v. Arizona, 384 U.S. 436 (1966).

         At about this time, the dispatcher informed Officer Miller that an agent from ICE had

contacted the Alpine Police Department and asked if he could provide any assistance in the effort

to identify Mr. Lara-Garcia.  ICE official David Ward, the resident agent in charge for central

Utah, testified that he was monitoring the traffic stop over a police radio.  Agent Ward testified

that he heard "an Alpine officer requesting a Spanish speaker."  (Transcript of March 24, 2006

Evidentiary Hearing ("3/24/05 Tr.") at 7.)  According to Agent Ward, ICE officials offer

assistance to local law enforcement when they believe the language skills of ICE agents or the

use of ICE's resources could aid in an investigation.  There is apparently no official policy that

governs these offers of aid.  Rather, Agent Ward indicated that ICE offers assistance in a spirit of

inter-agency cooperation and in an effort to solidify good working relationships between different law enforcement units.  Agent Ward testified that it is unlikely that ICE would offer local law enforcement assistance on a routine traffic stop.  But considering the potential language barrier and the N.C.I.C. hit, Agent Ward admitted that the stop of Mr. Lara-Garcia piqued his interest.  He contacted ICE Agent Timothy Chard and instructed him to inquire whether the Alpine Police Department would like assistance in identifying Mr. Lara-Garcia.  Officer  Miller answered that he could use ICE's help.

Questioning by Agent Chard

Officer Miller testified that "at the time [ICE] arrived at our police department I turned the case over to [Agent Chard]."  (8/30/05 Tr. at 71.)  At this point, Officer Miller had not confirmed whether Mr. Lara-Garcia was the subject of the California warrant.  Officer Miller testified: "I advised Agent Chard . . .  of the findings that I was told through our dispatch. [I] [a]lso advised him of what originated the stop so far as a reckless driving complaint.  After that, [Agent] Chard took over and left with [Mr. Lara-Garcia]."  (Id. at 73.)  Agent Chard first saw Mr. Lara-Garcia in a conference room at the Alpine police station.

Agent Chard testified that he and another ICE agent "went in [the conference room] and talked to Mr. [Lara-Garcia] and basically asked him information about his name, his date of birth, place of birth, and his immigration status in the United States."  (Id. at 78-79.)  Mr. Lara-Garcia was not informed of his Miranda rights before Agent Chard asked these questions.  Agent Chard testified that Mr. Lara-Garcia responded to his questions by stating that "his name was Juan Garcia . . . . And that he was from Mexico and is illegally in the United States."  (Id. at 79.) After talking with Mr. Lara-Garcia, Agent Chard made a telephone call to check whether there were any immigration records for a "Juan Garcia" with the date of birth provided by Mr. Lara-

Garcia.  Agent Chard testified that "[w]e have a command center that has people on duty 24

hours a day that we can call and give them information.  They'll run it through our database.

And I gave them the name and date of birth that he gave me to check into our database to see if

he's ever been in contact with immigration for legal residency, deportations or visas.  It's all in

the database."  (3/24/06 Tr. at 37.)  The database check returned no information.

      After checking the immigration database, Agent Chard left the conference room.  At this

point, the Alpine police had received sufficient information from California to verify that Mr.

Lara-Garcia was not the person named in the warrant.   Agent Chard testified:

> I asked [the officer] what they were going to do with [Mr. Lara-Garcia], if they
> were going to book him in the jail or not.  And they said that they've already cited
> him for these [traffic violations] that they did the traffic stop on, and since they
> clarified that it wasn't him on the N.C.I.C. they were just going to release him.
> And so we took custody of [Mr. Lara-Garcia].

(8/30/05 Tr. at 79.)

      Shortly after arriving at the ICE office, the agents made further attempts to verify Mr.

Lara-Garcia's identity.  Agent Chard testified: "We have a system that's called the Ident

machine, and anybody that we come in contact with we assign an alien file to that individual and

then put them on the Ident machine to identify them."  (Id. at 80.)  Agent Chard ran Mr. Lara-

Garcia's right and left index fingerprints through the machine and "received a hit under . . . his

correct name Lara-Garcia."  (Id.)  Through this database, Agent Chard discovered that Mr. Lara-

Garcia "was a prior aggravated reentry."  (Id.)  Mr. Lara-Garcia admitted that Lara-Garcia was

his correct name.  Mr. Lara-Garcia was then read his Miranda rights and ultimately gave a

written statement to another agent.

## ANALYSIS

      In his motion to suppress, Mr. Lara-Garcia challenges the scope of his detention

following the traffic stop for reckless driving.  Mr. Lara-Garcia does not challenge the validity of

the initial stop.  Specifically, Mr. Lara-Garcia contends that the officers did not have a sufficient

basis to detain him to investigate his immigration status and that all evidence obtained as a result

of his detention, including evidence of his identity, should be suppressed.  The court concludes

that Mr. Lara-Garcia's detention was permissible.  But the court holds that Agent Chard violated

Mr. Lara-Garcia's Miranda rights when he asked Mr. Lara-Garcia about his immigration status.

As a result, Mr. Lara-Garcia's response to that question must be suppressed.  Nevertheless, the

court concludes that law enforcement officials would have inevitably identified Mr. Lara-Garcia

and therefore declines Mr. Lara-Garcia's request to suppress all evidence obtained by law

enforcement after Mr. Lara-Garcia answered the improper question.

### The Officers Had a Sufficient Basis to Initially Stop Mr. Lara-Garcia and to Detain Him Until They Could Determine Whether He Was the Person Sought by the Warrant.

A traffic stop is generally analyzed "under the principles pertaining to investigatory

detentions."  United States v. Tibbetts, 396 F.3d 1132, 1136 (10th Cir. 2005).  A court asks "first

whether the officer's action was justified at its inception, and second, whether it was reasonably

related in scope to the circumstances that justified the interference in the first place."  Id.

Officers may initiate an investigatory detention only if they have a reasonable, articulable

suspicion of criminal activity.  Terry v. Ohio, 392 U.S. 1, 21-22 (1968).

Mr. Lara-Garcia concedes that Officer Miller and Detective Verde had sufficient

reasonable suspicion to initiate a traffic stop based upon the report of reckless driving.  The

question is whether the detention following the stop was unreasonable.

If a detention is supported by reasonable suspicion, officers are generally permitted to

detain a person to ascertain his or her identity.  See Terry, 392 U.S. at 22-23 (brief questioning

during stop permitted to ascertain identity); United States v. Bustillos-Munoz, 235 F.3d 505, 514

(10th Cir. 2001) (officer's request for license and registration permitted even though officer had already determined driver not guilty of traffic violation).

Here, Mr. Lara-Garcia possessed no identification, was unable to remember his social security number, and gave several different names when Officer Miller asked him to identify himself.  Given the circumstances, Officer Miller was entitled to verify whether a valid driver's license had been issued to an individual with the name Mr. Lara-Garcia provided and also to determine whether Mr. Lara-Garcia had any outstanding warrants. See United States v. Holt, 264 F.3d 1215, 1221 (10th Cir. 2001) ("[T]he motorist may be detained for a short period while the officer runs a background check to see if there are any outstanding warrants or criminal history pertaining to the motorist even though the purpose of the stop had nothing to do with such prior criminal history."); United States v. Elliott, 107 F.3d 810, 813 (10th Cir. 1997) ("A law enforcement officer conducting a routine traffic stop may request a driver's license and vehicle registration, run a computer check, and issue a citation.").

An officer can prolong a traffic stop if the officer "has an objectively reasonable and articulable suspicion that illegal activity has occurred or is occurring." United States v. Hunnicutt, 135 F.3d 1345, 1349 (10th Cir. 1998); see also United States v. Cervine, 347 F.3d 865, 868-69 (10th Cir. 2003).  Accordingly, once Officer Miller received information that there was an outstanding warrant for "Juan Garcia," the name given him by Mr. Lara-Garcia, Officer Miller had reasonable suspicion to detain him until he could determine whether Mr. Lara-Garcia was wanted in California.

Mr. Lara-Garcia contends that his detention evolved into a custodial arrest that must be supported by probable cause.  And it does appear that, at some point, Officer Miller did arrest Mr. Lara-Garcia, more than likely when he took him to the Alpine police station.  Probable cause

exists where "the facts and circumstances within [the officer's] knowledge and of which they had reasonably trustworthy information [are] sufficient to warrant a prudent man in believing that the [arrestee] had committed or was committing an offense." United States v. Klein, 93 F.3d 698, 701 (10th Cir. 1996) (internal quotation omitted); accord United States v. Gama-Bastidas, 142 F.3d 1233, 1240-41 (10th Cir. 1998).

After informing dispatch of the name and birth date provided by Mr. Lara-Garcia, Officer Miller learned that there was an outstanding warrant in California for an individual with that name and birth date.  While on the roadside, Officer Miller received some information about the physical characteristics of the individual named in the warrant.  Officer Miller testified that the physical description he received largely matched Mr. Lara-Garcia.  Specifically, Officer Miller stated that "[a]s far as the matches, yes, everything matched that I could get, other than a photograph, which I did not have. So, yes, everything that dispatch had told me matched the individual that they had relayed from California."  (8/30/05 Tr. at 59.)  The court concludes that Officer Miller had probable cause to take Mr. Lara-Garcia into custody and to continue his efforts to confirm whether Mr. Lara-Garcia was the individual named in the warrant.  It was certainly reasonable for Officer Miller to believe that Mr. Lara-Garcia was the individual named in the California warrant based on the name and birth date provided by Mr. Lara-Garcia and the fact that Mr. Lara-Garcia essentially matched the physical description of the individual named in the California warrant.

The court also notes that Officer Miller had probable cause to arrest Mr. Lara-Garcia based on the traffic violations themselves.  See United States v. Santana-Garcia, 264 F.3d 1188, 1192 (10th Cir. 2001) (concluding that probable cause to make an arrest "arose seconds into [a traffic] stop" because the officer quickly ascertained that the driver did not possess a driver's

license, a class C misdemeanor under Utah law for which an officer is entitled to make an arrest).
To the extent that the detention of Mr. Lara-Garcia may have evolved into an arrest, it was
supported by probable cause.

### Agent Chard failed to Inform Mr. Lara-Garcia of His Miranda Rights Before Inquiring About His Immigration Status.

Mr. Lara-Garcia was wearing handcuffs when he was placed in the conference room at
the Alpine police station.  His detention had already lasted approximately two hours.  Agent
Chard entered the conference room and asked Mr. Lara-Garcia his name, place and date of birth,
and his immigration status.  Mr. Lara-Garcia once again provided the false name "Juan Garcia,"
but admitted that he was not legally in the United States.  Mr. Lara-Garcia argues that Agent
Chard's questioning violated his Miranda rights and that all actions taken by law enforcement
after he admitted his illegal status were tainted by the improper question.

It is undisputed that Mr. Lara-Garcia had not been informed of his Miranda rights at the
time Agent Chard began questioning him.  Before officers can question individuals in custody,
Miranda requires officers to inform them that they have the right to remain silent, that any
statements may be used against them at trial, that they have the right to have an attorney present,
and that if they cannot afford an attorney, the government will provide one.  384 U.S. at 478-79.
Absent proof that proper warnings were given, evidence obtained through custodial interrogation
is inadmissible at trial.  Id. at 479.  "[T]wo requirements must be met before Miranda is
applicable; the suspect must be in 'custody,' and the questioning must meet the legal definition
of 'interrogation.'"  United States v. Perdue, 8 F.3d 1455, 1463 (10th Cir. 1993).

When determining whether an individual is in custody for the purposes of Miranda, it is
necessary to assess the objective circumstances of the situation from the perspective of the
individual being questioned.  Stansbury v. California, 511 U.S. 318, 323 (1994).  "A person is 'in

11

custody' for the purposes of Miranda if he 'has been deprived of his freedom of action in any significant way,' Miranda, 384 U.S. at 444, 86 S.Ct. at 1612, or his freedom of action has been curtailed to a 'degree associated with a formal arrest,' California v. Beheler, 463 U.S. 112, 1125, 103 S.Ct. 3517, 3520, 77 L.Ed.2d 1275 (1983) (per curiam)." U.S. v. Ritchie, 35 F.3d 1477, 1485 (10th Cir. 1994). Here, in light of all the circumstances, including the fact that Mr. Lara-Garcia was handcuffed and taken to the Alpine police station, the court concludes that Mr. Lara-Garcia was in custody for the purposes of Miranda at the time he was questioned by Agent Chard.

Having concluded that Mr. Lara-Garcia was in custody at the time he was questioned by Agent Chard, it must now be determined whether Agent Chard's questioning amounted to "interrogation." Questions asked while a suspect is in custody constitute interrogation if, under all the circumstances involved in a given case, the questions are "reasonably likely to elicit an incriminating response from a suspect." Rhode Island v. Innis, 446 U.S. 291, 301 (1980); see also United States v. Rambo, 365 F.3d 906, 909 (10th Cir. 2004). Law enforcement officials are permitted to ask for routine biographical information, as well as "routine booking questions." But "where questions regarding normally routine biographical information are designed to elicit incriminating information, the questioning constitutes interrogation subject to the strictures of Miranda." United States v. Parra, 2 F.3d 1058, 1068 (10th Cir. 1993). Agent Chard's questioning went beyond the scope of routine booking information or an inquiry related to routine biographical information. Agent Chard permissibly asked Mr. Lara-Garcia for his name, birth date, and place of birth. But when Agent Chard asked Mr. Lara-Garcia about his immigration status without first informing Mr. Lara-Garcia of his Miranda rights, Agent Chard failed to assure that Mr. Lara-Garcia's Fifth Amendment right to not offer self-incriminating

12

information would be protected.

Generally, the warnings required by <u>Miranda</u>, are prophylactic in nature and designed to protect against potential violations of the Fifth Amendment at trial. <u>United States v. Patane</u>, 542 U.S. 630, 636 (2004). "Failure to administer <u>Miranda</u> warnings creates a presumption of compulsion" implicating the Fifth Amendment, which prohibits the use of compelled testimony by the prosecution in its case in chief.  <u>Oregon v. Elstad</u>, 470 U.S. 298, 306-07 (1985). Accordingly, failure to read a suspect his <u>Miranda</u> rights requires the suppression of those statements.  But the Supreme Court has held that a violation of the prophylactic <u>Miranda</u> requirement, as compared with an actual constitutional violation, does not necessarily require the suppression of the fruits of that violation.  <u>See</u> <u>Patane</u>, 542 U.S. at 641-42 ("Potential [constitutional] violations occur, if at all, only upon the admission of unwarned statements into evidence at trial.  And, at that point, the exclusion of the unwarned statements . . . is a complete and sufficient remedy for any perceived <u>Miranda</u> violation.") (internal quotation and alteration omitted); <u>Elstad</u> 470 U.S. at 307-308 ("[T]he <u>Miranda</u> presumption . . . does not require that the statements and their fruits be discarded as inherently tainted.").  Under the rationale of <u>Patane</u>, any fruits of an unwarned, but voluntary statement are not subject to suppression.  <u>See</u> <u>Bihn Ky</u> <u>v. Yarbrough</u>, 2006 WL 657119 (E.D. Cal.) (March 15, 2006) ("Even if petitioner's statement was obtained in violation of <u>Miranda</u>, neither the briefcase nor its contents could have been excluded from evidence on the theory that they were the tainted fruit of the <u>Miranda</u> violation. There is no evidence before this court . . . that [petitioner] was coerced into admitting that he owned the briefcase.  Rather, the petitioner voluntarily answered the officer's question regarding ownership of the briefcase.") (citing <u>Patane</u>, 542 U.S. at 642-44).

Here, Mr. Lara-Garcia's statement that he is in the United States illegally must be

13

suppressed because he was not informed of his Miranda rights at the time Agent Chard asked about his immigration status.  But the failure to inform Mr. Lara-Garcia of his rights does not necessarily dictate the suppression of all subsequently obtained evidence.  As just discussed, the exclusionary rule does not operate to suppress fruits of an unwarned, but voluntary statement. The court notes that evidence as to the voluntariness of Mr. Lara-Garcia's admission that he was in the United States illegally has not been significantly developed.  But there is no need to determine whether Mr. Lara-Garcia's statement was, in fact, voluntary because even if an independent due process violation occurred during Agent Chard's questioning, the inevitable discovery exception to the exclusionary rule compels the admission of the evidence obtained by law enforcement after Mr. Lara-Garcia admitted he was in the United States illegally.

### Even Absent Mr. Lara-Garcia's Admission, Agent Chard's Continued Investigation Was Permissible and the Discovery of Mr. Lara-Garcia's Identity Was Inevitable.

After Agent Chard arrived at the Alpine police station, he interviewed Mr. Lara-Garcia, obtained his admission that he was in the country illegally, and checked the name and birth date provided by Mr. Lara-Garcia against immigration records.  Agent Chard was then informed by the Alpine police that they were prepared to release Mr. Lara-Garcia because they had determined that he was not the man identified in the California warrant.  At that time, Agent Chard took custody of Mr. Lara-Garcia.

Mr. Lara-Garcia contends that Agent Chard took custody of him based only on Mr. Lara-Garcia's statement that he was in the United States illegally and that no probable cause supported his continued detention by Agent Chard after the Alpine police decided to abandon their investigation.  Mr. Lara-Garcia's argument is premised on a misconception of the purpose and permissibility of ICE's involvement in Mr. Lara-Garcia's detention.

Mr. Lara-Garcia argues that Agent Chard began an investigation separate and apart from

14

that being undertaken by the Alpine police.  Specifically, he contends that the Alpine police were

investigating whether Mr. Lara-Garcia was the individual identified in the California warrant,

while Agent Chard was investigating (at his own invitation and without the requisite level of

suspicion) whether Mr. Lara-Garcia was in the United States illegally.  But the record establishes

that Officer Miller requested Agent Chard's assistance in connection with the effort to identify

Mr. Lara-Garcia.  (See, e.g., 8/30/05 Tr. at 59, ("At that time I believe dispatch advised met that

[ICE] would be more than happy to assist, and . . . I advised Mr. Garcia he was going to go up to

our police department and further do the investigation as far as to make sure [who] he was . . .

.").)  Further, it is well established that an investigatory detention premised on reasonable

suspicion of a violation of one crime can permissibly lead to suspicion that a detained individual

has committed other crimes.

For example, in United States v. Galindo-Gonzales, 142 F.3d 1217 (10th Cir. 1998), the

Tenth Circuit addressed a detention that occurred at a New Mexico roadblock.  The roadblock

was established "to ensure that motorists had valid driver's licenses, vehicle registrations, and

proof of insurance."  Id. at 1219.  The officers manning the roadblock stopped the defendant,

Victor Manuel Galindo-Gonzales, who had a valid driver's license but no registration.  Id.  The

officers later determined that the vehicle was validly registered.  Id. at 1220.  But while checking

the vehicle registration, the officers became suspicious that Mr. Galindo-Gonzales was

transporting illegal aliens.  Id.  As a result, the officers continued to detain Mr. Galindo-Gonzales

and his passengers even though "the checkpoint's initial purpose had been fulfilled."  Id.

Here, Agent Chard offered to assist the Alpine police in their effort to determine the

identity of Mr. Lara-Garcia.  During the course of offering this aid, Agent Chard was not

prohibited from developing a suspicion of criminal activity of a different kind than that originally

motivating Mr. Lara-Garcia's detention.  Indeed, Agent Chard testified that he has significant experience investigating immigration violations, and it should come as no surprise that law enforcement officials who possess expertise in certain criminal areas may develop suspicions that might not occur to other officials.

The court acknowledges that Agent Chard violated the prophylactic protection afforded by <u>Miranda</u> when he asked Mr. Lara-Garcia about his immigration status.  As a result, Mr. Lara-Garcia's response must be suppressed.  But the court is convinced that Agent Chard would have taken custody of Mr. Lara-Garcia and ultimately discovered Mr. Lara-Garcia's identity even if he had not asked Mr. Lara-Garcia about his immigration status.  The court concludes that the inevitable discovery exception to the exclusionary rule applies because the objective facts establish that Agent Chard possessed probable cause to retain custody over Mr. Lara-Garcia on suspicion of an immigration violation, even when Mr. Lara-Garcia's admission that he was in the United States illegally is not considered.

Probable cause exists when police have knowledge of facts and circumstances to warrant a belief by a prudent person that an offense has been or is being committed.  <u>Wong Sun v. United States</u>, 371 U.S. 471, 479 (1963).  "[P]robable cause can rest upon the collective knowledge of the police, rather than solely that of the officer who actually makes the arrest."  <u>United States v. Merritt</u>, 695 F.2d 1263, 1268 (10th Cir. 1982).

At the time Agent Chard took custody of Mr. Lara-Garcia, the Alpine police knew that Mr. Lara-Garcia possessed no identification, had provided inconsistent names when asked to identify himself, and had been unable to remember his social security number.  Additionally, Agent Chard testified that, based on his experience, he believed that English was not Mr. Lara-Garcia's native language.  Agent Chard had also checked the name and birth date provided by

Mr. Lara-Garcia against immigration records and had uncovered no information.  Even if Agent Chard assumed that the name Mr. Lara-Garcia provided was correct, the fact that no match was found in the immigration records indicated to Agent Chard that Mr. Lara-Garcia was either a natural born citizen or was in the country illegally and had not had contact with law enforcement.  Under the circumstances, the court concludes that Agent Chard possessed probable cause to continue to hold Mr. Lara-Garcia and further investigate his immigration status.

Not only did Agent Chard have probable cause to retain custody over Mr. Lara-Garcia even if Mr. Lara-Garcia's statement is suppressed, but the court concludes that such a result was inevitable.  "The inevitable discovery doctrine provides an exception to the exclusionary rule and permits evidence to be admitted if an independent, lawful police investigation inevitably would have discovered it."  United States v. Cunningham, 413 F.3d 1199, 1203 (10th Cir. 2005).  To benefit from the inevitable discovery exception, the government must establish by a preponderance of the evidence that the allegedly tainted evidence would have inevitably been discovered by lawful means.  See id.; see also United States v. Souza, 223 F.3d 1197, 1202 (10th Cir. 2000) ("[T]he exclusionary rule is inapplicable if the evidence inevitably would have been discovered by lawful means.").

The court is satisfied, by a preponderance of the evidence, that Agent Chard would have followed up on his suspicions that Mr. Lara-Garcia was in the United States illegally, even if Agent Chard had never questioned Mr. Lara-Garcia directly about his immigration status.  As discussed above, law enforcement officials were aware of multiple facts indicating that Mr. Lara-Garcia was not in the United States legally.  When discussing the practice of using ICE's Ident machine, Agent Chard testified as follows: "We have a system that's called the Ident machine, and anybody that we come in contact with we assign an alien file to that individual and then put

17

them on the Ident machine to identify them." (8/30/05 Tr. at 80.)  Law enforcement officials had sufficient information, even absent Mr. Lara-Garcia's admission, to investigate Mr. Lara-Garcia's immigration status.  Based on the testimony offered at the evidentiary hearings, the court is persuaded that Agent Chard would have continued his efforts to confirm Mr. Lara-Garcia's immigration status and that his attempts to do so would have been adequately supported by probable cause.  See United States v. Alvarez-Gonzalez, 319 F.3d 1070, 1072 (8th Cir. 2003) ("Even if Oxner's and Soland's questions about Alvarez-Gonzalez's immigration status were improper, we agree with the district court that discovery of Alvarez's gun and status as an illegal alien was inevitable. . . . [T]here is a reasonable probability the officers would have continued to attempt to confirm Alvarez-Gonzalez's identity and discovered his status as an illegal alien.").

The court is well aware that Agent Chard's testimony at the evidentiary hearings indicates that Mr. Lara-Garcia's statement that he was in the United States illegally was the primary force behind Agent Chard's decision to take custody of Mr. Lara-Garcia on suspicion of immigration violations.  But the court is convinced that Agent Chard's actions were objectively reasonable even if his subjective motivations were overpowered by Mr. Lara-Garcia's tainted admission.  The situation here is similar to that in Galindo-Gonzalez, where the Tenth Circuit upheld an officer's questioning of detained individuals even though the officer testified that his questioning was motivated by a legally impermissible purpose.  See 142 F.3d at1224 ("[O]ur analysis of the reasonableness of Officer Martinez's questions under the Fourth Amendment is not limited by his own account of his motivation in asking them."); see also Whren v. United States, 517 U.S. 806, 812-14 (1996) ("Not only have we never held, outside the context of inventory search or administrative inspection . . . that an officer's motive invalidates objectively justifiable behavior under the Fourth Amendment; but we have repeatedly held and asserted to

18

the contrary."); <u>Scott v. United States</u>, 436 U.S. 128, 138 (1978) ("[T]he fact that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken so long as the circumstances, viewed objectively, justify that action.").

For the foregoing reasons, the court suppresses Mr. Lara-Garcia's statement that he was in the United States illegally.  But the court declines to suppress any evidence discovered by law enforcement after the tainted statement was made.

**SPEEDY TRIAL**

This case was filed on June 8, 2005.  On July 11, 2005, Mr. Lara-Garcia filed his Motion to Suppress.  The court initially ruled on Mr. Lara-Garcia's motion on December 28, 2005. Since that time, the court and the parties have been consumed by motions that pertain to Mr. Lara-Garcia's Motion to Suppress.  The issues raised have been unusually complex and the resolution of those issues have been of great importance.   The proper resolution of these issues outweighs the public's interest in a speedy trial.  <u>See</u> 18 U.S.C. § 3161(h)(1)(F), 3161(h)(8)(A), and 3161(h)(8)(B)(ii).  As a result, the court concludes that thirty-four days have expired on Mr. Lara-Garcia's speedy trial clock.

**ORDER**

For the reasons set forth, Mr. Lara-Garcia's Motion to Suppress is GRANTED in part and DENIED in part.  Mr. Lara-Garcia's statement that he is in the country illegally is suppressed, but all evidence obtained by law enforcement after that statement was made, including Mr. Lara-Garcia's fingerprints and A-file, would have been inevitably discovered by lawful means and therefore is not suppressed.  The United States' Motion for Fingerprint Exemplar is DENIED as moot.  The United States' Motion to Reconsider Motion to Clarify Time Remaining Under

19

Speedy Trial Act is DENIED in part as moot and GRANTED insofar as this amended order clarifies the time remaining on Mr. Lara-Garcia's speedy trial clock.  Defendant's Motion to Suppress all Fruits of the Poisonous Tree & Objection to Certain Findings of Fact is DENIED as moot given the issuance of this amended order.  The court also DENIES Defendant's Motion to Reconsider Ruling Re: Making Additional Argument for Facts Advanced at Second, Evidentiary Hearing.  The court previously determined that additional briefing on the suppression issue is unnecessary and reaffirms that decision.  Finally, the court DENIES Defendant's Motion to Dismiss as MOOT given the issuance of this amended order.

SO ORDERED this 30th day of March, 2006.

BY THE COURT:

TENA CAMPBELL
United States District Judge